## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **MELVIN FEIGENBAUM, individually on his own behalf and on behalf of all other persons similarly situated, and as Trustee of the Tinton Falls Conva-Center Employee Benefit Plan, TINTON FALLS CONVA-CENTER EMPLOYEE BENEFIT PLAN, TINTON FALLS CONVALESCENT CENTER, INC.,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**SUMMIT HEALTH ADMINISTRATORS, INC., HEALTH ADMINISTRATORS, INC., MILLENIUM PLANNING, INC., NICHOLAS POLLY, DAMIAN SYLVIA,**<br><br>**Defendants.** | **MASTER FILE: 01-CV-805 (WJM)**<br><br><br>**OPINION**<br><br>**HON. WILLIAM J. MARTINI** |

Samuel N. Reiken
150 River Road
Suite J-1
Montville, NJ 07045

(*Counsel for Plaintiffs*)

Richard D. Brown
Green, Savits & Lenzo, LLC
35 Airport Road
Suite 350
Morristown, NJ 07960

Michael J. Fagan
Stevens & Lee, PC
1415 Route 70 East
Suite 506
Cherry Hill, NJ 08034

Louis P. Digiaimo
McElroy, Deutsch, Mulvaney & Carpenter, LLP
1300 Mount Kemble Avenue
PO Box 2075
Morristown, NJ 07962-2075

Avrin Slatkin
McElroy, Deutsch, Mulvaney & Carpenter, LLP
1300 Mount Kemble Avenue
PO Box 2075
Morristown, NJ 07962-2075

(*Counsel for Defendants*)


**WILLIAM J. MARTINI, U.S.D.J.:**

Defendants move for summary judgment to dismiss Plaintiffs' claims filed under ERISA and state law, including Plaintiffs' breach of contract claim.  With respect to Plaintiffs' ERISA claims, Defendants argue that they are not fiduciaries with respect to Plaintiffs and thus not subject to suit under ERISA.  With respect to Plaintiffs' state law claims, Defendants argue that ERISA preempts those claims and also that Defendants breached no cognizable duty to Plaintiffs under state law.  Finally with respect to all claims, Defendants argue that Plaintiffs have no evidence of damages.  The Court finds that material facts preclude summary judgment on all of Plaintiffs' claims except Plaintiffs' breach of contract claim, which the Court dismisses.  Accordingly, Defendants' motion is **DENIED IN PART** and **GRANTED IN PART**.

## I.      BACKGROUND

This is essentially a dispute between an employee health plan and its stop-loss

insurer.  The three Plaintiffs are (1) Tinton Falls Convalescent Center, Inc., an employer,

(2) Tinton Falls Conva-Center Employee Benefit Plan ("Plan"), and (3) Melvin

Feigenbaum, the plan's trustee.[1]  Plaintiffs had purchased stop-loss insurance through the

two remaining Defendants: (1) Millenium Planning, Inc. ("Millenium"), a health

insurance agency, and (2) Damian Sylvia, Millenium's President.[2]  Generally, Plaintiffs

allege that Defendants failed to fulfill their insurance obligations by allowing a time gap

to develop during which Plaintiffs were without stop-loss insurance.

### A.    Facts

As of early 1998, Tinton Falls maintained the Plan for the benefit of certain

employees.  (Compl. ¶ 10; Slatkin Cert. Ex. B.)  At the time, the Plan was "fully-insured"

(Pl.'s Rule 56.1 Counter-Statement of Material Facts ¶ 7), that is, the Plan paid a

premium to an insurance provider who in exchange assumed financial responsibility for

the medical expenses of the Plan's beneficiaries.  To find and provide this insurance to

the Plan's beneficiaries, trustee Feigenbaum had for many years worked with Millenium

President Sylvia, who acted as the Plan's insurance broker.  (Cert. of Peter Romero Ex. A

42:8–11.)

In early 1998, Sylvia convinced Feigenbaum to change the plan from "fully-

---

[1]Feigenbaum initially sued on his own behalf as a plan participant and on behalf of
other similarly situated participants.  However, Feigenbaum has since relinquished his
class claims.  (Cert. of Avrin Slatkin Ex. F.)

[2]Plaintiffs originally asserted claims against other Defendants, but now only
Millenium and Sylvia remain.

insured" to "self-insured" (Aff. of Damian Sylvia ¶ 4; Pl.'s Facts ¶ 7), that is, the Plan

would itself assume financial responsibility for the medical expenses of its beneficiaries.

Sylvia told Feigenbaum that self insurance would be cheaper than full insurance.

(Romero Cert. Ex. B 39:20–25.)  To administer this self-insurance, the Plan hired Summit

Health Administrators, Inc. ("Summit").  (Compl. ¶ 46.)  The Plan accordingly paid

Summit approximately $30,000 each month for administration and funded the self-

insurance by paying Summit approximately $100,000 each month to cover the cost of any

claims from Plan beneficiaries.  (Compl. ¶¶ 32, 43.)

   To protect against the risk of excessive claims, Sylvia also convinced Feigenbaum

to purchase "stop-loss" insurance.  (Sylvia Aff. ¶ 5.)  Stop-loss insurance allows the

insured to bear the risk of few or small claims but protects the insured from the risk of

many or large claims.  Feigenbaum purchased this stop-loss insurance from the Life

Insurance Company of North America ("LINA").  (Aff. of Melvin Feigenbaum ¶¶ 7, 9.)

Under the initial terms of the stop-loss policy, LINA agreed to pay for any individual

claim to the extent that it exceeded $35,000 (the "specific deductible") and to pay for the

aggregate cost of all claims to the extent that they exceeded $376,565 (the "aggregate

deductible).  (Aff. of Damian Sylvia Ex. A.)

   The term of the stop-loss policy was to run from October 1, 1998, until September

30, 1999.  (Silvia Aff. Ex. A.)  The policy was what is known as a "12/12" policy, which

means that LINA agreed to pay stop-loss insurance for claims that were both incurred and

processed within the twelve month policy period.[3]  (Slatkin Cert. Ex. K 54:17–55:13.)
Thus under this stop-loss policy, the Plan remained completely exposed to any medical
claims of its members either incurred or processed after September 30, 1999.  The
vulnerability grew in August 1999 when the Plan added additional employees to its
coverage and the Plan and LINA amended their contract to increase the aggregate
deductible to $1,200,000.  (Romero Cert. Exs. M, N; Sylvia Aff. ¶ 9.)

Because the stop-loss insurance was going to expire on September 30, 1999, the
parties sought to obtain stop-loss insurance from another carrier to begin on October 1,
1999.  This, however, proved difficult.  Obtaining new stop-loss insurance required the
Plan to submit to the new insurer a disclosure form—a form that discloses various
information about the claims made to and the beneficiaries of prior insurance policies.
(Slatkin Cert. Ex. L 53:25–54:5.)  For various, unknown reasons, between October 1999
and January 2000, the parties were unable to deliver a signed, completed disclosure form
to a new insurer.[4]  (Romero Cert. Ex. H 44:17–46:17; Romero Cert. Exs. T, V.)
Accordingly, the Plan was without stop-loss insurance for several months.

Eventually, on January 22, 2000, the Plan was able to secure replacement stop-loss

---

[3]Often claims are not processed until months after they have been incurred.
(Romero Cert. Ex. E 49:21–50:7.)

[4]It is unclear from the record what actions the parties took to secure and submit
this form and thus who was at fault for the failure to secure and submit it.  For example,
Feigenbaum testified that Sylvia gave him a disclosure form to sign and that Sylvia took
the signed form with him, but Feigenbaum cannot remember when this occurred.
(Romero Cert. Ex. H 44:17–46:17.)

insurance, but this left a time gap during which the Plan remained vulnerable to large claims.  (Slatkin Cert. Ex. K 54:17–55:13.)  The replacement stop-loss insurance retroactively covered claims incurred up to three months before it was purchased, that is, claims incurred after October 22, 1999.  (Slatkin Cert. Ex. G 58:11–59:7; Statement of Uncontested Material Facts Submitted on Behalf of Defs. Pursuant to L. Civ. P. 56.1 ¶ 39.)  The replacement stop-loss insurance did not, however, cover claims incurred prior to October 22, 1999, even if they were not processed until after that date.  (Slatkin Cert. Ex. G 58:11–59:7; Defs.' Facts ¶ 39.)  Given that the Plan's initial stop-loss insurance did not cover claims incurred or processed after October 1, 1999, the Plan was wholly responsible for an uncovered set of claims: those incurred or processed after the September 30 end date of the initial insurance but incurred before the October 22 start date of the new insurance.  Additionally, the replacement stop-loss insurance covered only a maximum of $260,000 in aggregate claims.  (Slatkin Cert. Ex. G 59:5.)

**B.    Proceedings**

Based on this failure to secure full, continuous stop-loss insurance, Plaintiffs filed the instant suit.[5]  Plaintiffs sued Sylvia and Millenium, asserting claims under ERISA and also claims under state law for breach of contract, negligence, and professional

---

[5]Plaintiffs initially asserted that Defendants—which originally comprised not only Sylvia and Millenium, but also Summit, Summit President Nicholas Polly, and Health Administrators, Inc.—engaged in other possibly tortious conduct.  However, Sylvia and Millenium are now the only remaining Defendants, and the Court has limited Plaintiffs' claims to damages resulting from the gap in stop-loss insurance.

malpractice.  (Compl. ¶¶ 74–99.)

The remaining Defendants, Sylvia and Millenium, now move for summary judgment on all of Plaintiffs' claims.  With respect to the ERISA claims, Defendants argue that Plaintiffs cannot maintain these claims because Defendants were not fiduciaries of the Plan under ERISA.  (Mem. in Supp. of Defs.' Mot. for Summ. J. 14.) With respect to Plaintiffs' state claims, Defendants argue that ERISA preempts these claims.  (Mot. 23.)  Defendants also argue that they breached no cognizable duty to Plaintiffs under state law.  (Mot. 21.)  Finally, Defendants argue that Plaintiffs cannot establish that they suffered any damages.  (Mot. 28.)

## II.   DISCUSSION

The Court will grant summary judgment on a claim "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Lexington Ins. Co. v. W. Pa. Hosp., 423 F.3d 318, 322 n.2 (3d Cir. 2005).  In reviewing a motion for summary judgment, the Court will draw all reasonable inferences in favor of the nonmovant.  Lexington, 423 F.3d at 322 n.2.

### A.   Whether Defendants Are Fiduciaries of the Plan and Thus Proper Defendants

The Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461, is a uniform statutory regime governing employee benefit plans.  Aetna Health Inc. v. Davila, 542 U.S. 200, 208 (2004).  One of the myriad ways that ERISA

accomplishes this is by providing a cause of action to an employee benefit plan against a

party who breaches certain fiduciary duties that the party owes under ERISA.  Employee

Retirement Income Security Act (ERISA) § 409(a), 29 U.S.C. § 1109(a).  Liability under

section 409(a) only attaches if the defendant was a fiduciary as defined by ERISA.  See

Pegram v. Herdrich, 530 U.S. 211, 226 (2000) ("In every case charging breach of ERISA

fiduciary duty, then, the threshold question is . . . whether that person was acting as a

fiduciary . . . ."); In re Mushroom Transp. Co., 382 F.3d 325, 346 (3d Cir. 2004) ("The

district court found that neither Continental nor PVHR were fiduciaries . . . and therefore

that § 1109(a) did not apply to them.  We concur.").

Defendants claim that Plaintiffs muster insufficient evidence to show that

Defendants were fiduciaries of the Plan.  Accordingly, Defendants argue that the Court

must dismiss Plaintiffs' ERISA claims.  The Court disagrees.

ERISA defines "fiduciary" as follows:

> Except as otherwise provided in subparagraph (B), a person is
> a fiduciary with respect to a plan to the extent (i) he exercises
> any discretionary authority or discretionary control respecting
> management of such plan or exercises any authority or control
> respecting management or disposition of its assets, (ii) he
> renders investment advice for a fee or other compensation,
> direct or indirect, with respect to any moneys or other
> property of such plan, or has any authority or responsibility to
> do so, or (iii) he has any discretionary authority or
> discretionary responsibility in the administration of such plan.

Employee Retirement Income Security Act (ERISA) § 3(21)(A), 29 U.S.C. §

1002(21)(A).  The test for determining whether entities not directly associated with the

8

Plan—such as Defendants—are fiduciaries is whether they exercise some authority or control over the plan or its assets.  See John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank, 510 U.S. 86, 96 (1993).  The determination does not hinge upon the entity's formal designation, such as a formal listing in the plan as a fiduciary, but rather upon the functional test described above.  Benvenuto v. Conn. Gen. Life Ins. Co., 643 F. Supp. 87, 90 (D.N.J. 1986); see § 409(a).  Thus an ERISA plan's insurer or insurance broker may be a fiduciary if it satisfies this functional test.

Indeed, many courts have found insurance providers or brokers to be fiduciaries under ERISA, given, of course, facts satisfying the Hancock test.  See, e.g., Reich v. Lancaster, 55 F.3d 1034, 1046–50 (5th Cir. 1995).  For example, where insurers play central roles in determining what benefits the plans will provide or where a plan de facto delegates its administration to an insurance agent or broker, courts have found those agents or brokers to be plan fiduciaries.  See Brink v. DaLesio, 496 F. Supp. 1350, 1074–76 (D. Md. 1980) (holding that an insurance broker was a fiduciary because he performed consulting and administrative services to the plan and because the plan's trustees relied heavily on this advice service).  In contrast, courts have found insurance providers or brokers not to be fiduciaries where they merely provide insurance or brokerage services to the plan.  See Schloegel v. Boswell, 994 F.2d 266, 270–73 (5th Cir. 1993); Fechter v. Conn. Gen. Life Ins. Co., 800 F. Supp. 182 (E.D. Pa. 1992).  The Court's inquiry is to locate where on the spectrum between mere provision of insurance

9

and de facto total control of plan decisions and assets the alleged fiduciary's actions lie.

Here, Plaintiffs present sufficient evidence that Defendants exercised control over plan decisions and assets to preclude summary judgment for Defendants on that issue.  It was Sylvia who first recommended that the Plan forgo full insurance for self insurance. (Romero Cert. Ex. B 19:3–10; Feigenbaum Aff. ¶ 5.)  Sylvia recommended LINA as the initial stop-loss insurer.  (Feigenbaum Aff. ¶ 7.)  More generally, Plaintiffs have put forth evidence that Sylvia acted as a de facto administrator of the Plan.  Feigenbaum relied heavily on Sylvia's advice and decisionmaking; indeed, the record suggests that Feigenbaum did not understand insurance and effectively delegated insurance decisions to Sylvia.[6]  Perhaps recognizing this, Sylvia appeared to communicate on behalf of the Plan to Summit, the Plan's administrator.[7]  Nicholas Polly, Summit's President, further confirmed this in his deposition:

> Q.    Did you have any contact with anyone at Tinton?

---

[6]Feigenbaum testified at a deposition that "I basically have no background when it comes to insurance.  I relied upon Damian [Sylvia] totally."  (Romero Cert. Ex. A 40:15–16.)

[7]Feigenbaum testified as follows:

> My relationship with Damian [Sylvia], that's what I base pretty much what went on.  That he was the one that I dealt with, he was the one who was running the show, he was the one that told me I'm not gonna run into problems.  So obviously, if he's the one I'm talking to, my trust is in him. Not in Summit, who I don't even know the company.  I think I met them one time, that was it.  (Romero Cert. Ex. A 46:8–15.)

10

> A.    Not often.  I may have written or I know I have written
>        a couple of letters to Mr. Feigenbaum, and I think I
>        spoke with him once or twice on the telephone.
>
> Q.    Did you ever personally meet with Mr. Feigenbaum?
>
> A.    No, sir.  (Romero Cert. Ex. G 22:13–21.)

Viewing the factual disputes in Plaintiffs' favor, Sylvia was making decisions for the Plan about what insurance it would purchase and from whom the Plan would purchase it.  These facts, if true, would make Sylvia and possibly Millenium plan fiduciaries within ERISA's definition.  See Miller v. Lay Trucking Co., 606 F. Supp. 1326, 1337 (N.D. Ind. 1985) (holding that an insurance company was a plan fiduciary because its agent was a fiduciary).[8]  Accordingly, the Court cannot determine on summary judgment that Plaintiffs may not asset ERISA claims against Defendants.

**B.    Whether ERISA Preempts Plaintiffs' State Law Claims**

Defendants argue that ERISA preempts Plaintiffs' state law claims.  The Court holds that whether ERISA so preempts Plaintiffs' state law claims depends upon whether Defendants are ERISA fiduciaries.  Since the Court cannot determine on summary judgment whether Defendants are fiduciaries, as explained above, the Court can neither determine on summary judgment whether ERISA preempts Plaintiffs' state law claims.

---

[8]Defendants do not argue that Millenium is not Sylvia's principal and thus cannot be a fiduciary even if Sylvia is.  Nor is there information in the record that would aid the Court in such a determination.  Accordingly, the Court declines to find on summary judgment that Millenium is not a fiduciary as well.

ERISA is comprehensive, powerful legislation promulgated by the federal government.  See Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 137 (1990).  With its enaction, Congress sought to create a uniform, federal body of benefits law to minimize the administrative and financial burden of complying with conflicting directives between states.  Pryzbowski v. U.S. Healthcare, Inc., 245 F.3d 266, 277 (3d Cir. 2001).  Accordingly, Congress structured ERISA to have certain preemptive effects on state laws.  ERISA preempts state laws in two ways.

First, ERISA completely preempts certain state law claims similar or identical to claims that may be brought under ERISA's civil enforcement section, section 502.  See id. at 271.  Congress intended ERISA's civil enforcement provisions to be the sole remedies for such breaches.  See id. at 271–73.  This first type of preemption is known as "complete preemption."

Second, ERISA expressly preempts state law claims that "relate to any employee benefit plan."  Employee Retirement Income Security Act (ERISA) § 514(a), 29 U.S.C. § 1144(a); Pryzbowski, 245 F.3d at 277.  Courts have held that claims "relate to" an employee benefit plan if they have a connection with or reference to such a plan.  Pryzbowski, 245 F.3d at 277.  To further clarify this broad statement, the Supreme Court has instructed courts to interpret this phrase by inquiring into "the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive."  N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,

12

514 U.S. 645, 656 (1995).  This type of preemption is known as "express preemption."

If Defendants are fiduciaries, it is nearly certain that ERISA completely preempts Plaintiffs' state law claims against them.  Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), allows plan fiduciaries to sue other plan fiduciaries for breach of the fiduciary duty.  Indeed, this is what Plaintiffs already allege in their ERISA claims.  As Congress has determined that section 502 should be the sole, uniform vehicle for such suits, ERISA preempts any similar or identical suits under state law, which Plaintiffs' claims undoubtedly are.[9]

However, if Defendants are not fiduciaries it is just as nearly certain that ERISA does not preempt Plaintiffs' state law claims.  While ERISA is sweeping legislation, it undoubtedly has its limits.  Hook v. Morrison Milling Co., 38 F.3d 776, 781 (5th Cir. 1994).  Many courts have held that ERISA does not preempt state regulation of the commercial contractual relationship between a plan and its non-fiduciary insurers for insurance purchased by the plan.  See, e.g., Bank of La. v. Aetna U.S. Healthcare Inc., 468 F.3d 237, 241–44 (5th Cir. 2006); Mich. Affiliated Healthcare Sys., Inc. v. CC Sys. Corp. of Mich., 139 F.3d 546, 549 (6th Cir. 1998); Geweke Ford v. St. Joseph's Omni Preferred Care Inc., 130 F.3d 1355, 1358–60 (9th Cir. 1997); cf. Painters of Phila. Dist. Council No. 21 Welfare Fund v. Price Waterhouse, 879 F.2d 1146, 1153 n.7 (3d Cir.

---

[9]As explained above, the Court has already limited all of Plaintiffs' claims to damages resulting from the gap in stop-loss insurance.

1989) ("ERISA does not generally preempt state professional malpractice actions.").

Here if Defendants were not fiduciaries but were rather mere insurance brokers, engaged in a simple commercial relationship with the Plan, then ERISA would not preempt Plaintiffs' state law claims for Defendants' alleged failure to abide by that relationship.

To reiterate, whether ERISA preempts Plaintiffs' state law claims against Defendants depends upon whether Defendants are Plan fiduciaries. Because the Court cannot determine on summary judgment whether Defendants are Plan fiduciaries, nor can it determine on summary judgment whether ERISA preempts Plaintiffs' state-law claims.

### C.   Whether Defendants Breached a State Law Duty

Defendants argue that Plaintiffs' state law claims—breach of contract, negligence, and professional malpractice—lack sufficient evidentiary support to survive summary judgment. Specifically, Defendants allege that Sylvia and Millenium had no duty to procure replacement stop-loss coverage. The Court disagrees although the Court does find that Plaintiffs present no evidence of a contract that Defendants breached, justifying dismissal of that count.

There are several duties that Defendants here may have breached. In New Jersey, "an insurance broker owes a duty to the insured to act with reasonable skill and diligence." Carter Lincoln-Mercury, Inc., Leasing Div. v. EMAR Group, Inc., 638 A.2d 1288, 1291 (N.J. 1994). See generally President v. Jenkins, 853 A.2d 247, 257 (N.J. 2004) (holding that insurance brokers and insurance agents generally owe the same duties

14

to an insured).  As part of this overarching duty, insurance brokers have a duty to inform

their insureds of imminent coverage lapses and to offer provisions to secure replacement

insurance.  See Brill v. Guardian Life Ins. Co. of Am., 666 A.2d 146, 157 (N.J. 1995)

("We have concluded previously that as a matter of law, the duty owed by a broker to an

applicant for insurance includes the duty to inform the potential insured of the availability

of immediate insurance coverage . . . ."); Commercial Union Assurance Cos. v. State

Farm Mut. Auto. Ins. Co., 385 A.2d 1286 (N.J. Super. Ct. L. Div. 1978).  Here, this is

precisely what Plaintiffs alleged Defendants failed to do: notify them of the lapse in stop-

loss insurance and offer to provide replacement insurance.  As described above, Plaintiffs

provide some evidence that Defendants failed to do this.  Accordingly, the Court cannot

hold on summary judgment that Defendants had no duty to help Plaintiffs secure

replacement stop-loss insurance.

However, the Court does agree with Defendants that Plaintiffs have failed to

provide any evidence of a contract that Defendants breached.  Indeed, Plaintiffs

confusingly state in their opposition to Defendants' motion that "[a]lthough the

relationship of broker to insured may be described as contractual, the cases have

recognized that the insured 'does not sue on a contract of insurance.'  Rather, the claim

asserted is based on the broker's negligent failure to procure the appropriate coverage.

The principle that duty is defined not by the contractual relationship between the parties

but by considerations of forseeability and fairness is applicable in the insurance context."

15

(Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. 39.) (citations omitted)  Given that Plaintiffs have provided no evidence of a contract that Defendants have breached and that Plaintiffs appear to admit that their state law claims against Defendants are properly grounded in negligence and professional malpractice—not contract—the Court dismisses Plaintiffs' breach of contract claim, contained in Count Four of their Complaint.

### D.    Whether Plaintiffs Have Suffered Damages

Defendants argue that Plaintiffs' claims must fail because Plaintiffs haven't suffered any damages.  The Court disagrees.

The Court finds that Plaintiffs indeed have presented evidence of damages.  As explained above, the Court has already limited Plaintiffs' damages to those resulting from the gap in stop-loss insurance between October 1, 1999, and January 22, 2000.  Plaintiff presents evidence that the Plan received medical claims during this period that were not covered by either the Plan's initial stop-loss insurance or its replacement stop-loss insurance.  Specifically, Plaintiffs' insurance expert, George Soria, testified in a deposition that the gap in stop-loss insurance resulted in the Plan being liable for claims that the initial stop-loss insurance would have covered had Defendants ensured that it remained in place.[10]  Accordingly, Plaintiffs have mustered sufficient evidence on

_____

[10]Soria's explanation of how he calculated this loss is slightly unclear.  (Romero Cert. Ex. E. 114:4–117:18; 141:7–22; Slatkin Cert. Ex. K 54:17–55:13.)  He appears to calculate the damages by determining when claims were filed and determining in the aggregate whether they were covered by the replacement insurance and whether they would have been covered by the initial stop-loss insurance had Defendants ensured that it

summary judgment to present the issue of damages to a jury.

Defendants make two relevant arguments to the contrary, which the Court finds unpersuasive.[11]  First, Defendants argue Soria failed to limit damages as required by the Court's order.  Defendant notes that Soria considered medical claims "provided before October 1, 1999."  (Mot. 30.)  But as explained above, if these claims were incurred before October 1, 1999 yet processed after that date, they would not have been covered by any stop-loss insurance.  They would thus fall precisely into the category of claims that might have been covered had Defendants maintained continuous stop-loss insurance.

Second, Defendants argue that "Feigenbaum has admitted that he individually reimbursed all plan members for unpaid medical fees" and concludes that the Plan thus suffered no damages.  (Mot. 19.)  To support this proposition, Defendants quote the following portion of Feigenbaum's deposition:

> Q.    Okay.  So as you sit here today, you can't recall any employees who are out of pocket money because of the lapse in insurance, because they were reimbursed by you; is that correct?
>
> A.    Well, I can't give you an exact name who they are, but

---

remained in place.  This would be a logical way to calculate damages.  However, Soria's ultimate conclusion that the gap in stop-loss insurance damaged the Plan is clear. Viewing these facts in Plaintiffs' favor, they constitute sufficient evidence of damages to preclude summary judgment on that issue.

[11]Defendants also argue that the only damages that Plaintiffs suffered consisted of fees paid to Soria.  The Court rejects this argument since, as explained above, Soria puts forth testimony supporting damages resulting from claims that could have been covered by stop-loss insurance.

there were people that were reimbursed.

Q.     They've all been reimbursed, as far as you know?

A.     Yes.  (Slatkin Cert. Ex. C 31:19–32:2.)

But the above-quoted portion of Feigenbaum's deposition only establishes that all Plan beneficiaries were reimbursed for their medical claims; it does not clearly establish who the reimbursing party was and whether it was the Plan.  Viewing this testimony in the light most favorable to Plaintiffs, it was the Plan—not Feigenbaum—who paid these medical claims.  In summary Plaintiffs have put forth sufficient evidence that the Plan suffered damages to allow their claims to proceed.

## III.   CONCLUSION

The Court dismisses Plaintiffs' breach of contract claim, contained in Count Four of the Complaint.  The Court declines to dismiss any other part of Plaintiffs' Complaint.  Defendants' motion is thus **GRANTED IN PART** and **DENIED IN PART**.  An Order accompanies this Opinion.

s/ William J. Martini
William J. Martini, U.S.D.J.